LEROI C. SLACK, petitioner-respondent,

*v.*

GRACE E. SLACK, defendant-appellant.

[Decided November 18th, 1918.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinion:

(After argument.)

I will decide the case without further consideration. The petitioner charges his wife with having committed adultery on the morning of December 25th, 1916, at her residence on Stuyvesant avenue, in Trenton.

These facts are undisputed in the case. The corespondent, Mitchell, was invited to the house to stay over night, on the afternoon or evening of December 24th. He went there about seven-thirty or eight o'clock and remained all night. Thompson, a boarder, but in fact a detective, on that night, was the only other adult occupant of the house up until about three o'clock in the morning. He then brought to the house the petitioner's father and Bowne, also a detective. Shortly afterwards, in response to a call by Thompson, Mrs. Slack came from her room and went downstairs with him to look for the source of a supposed fire; Thompson having stated to her when he called her that her house was on fire. From the time that she got back to her room—a little after three o'clock—until half-past seven in the morning, the defendant and the corespondent were in that room together; and at half-past seven in the morning, after Mrs. Slack returned from downstairs, after a telephone call, Bowne, the detective, walked in upon them, and found them both on the bed, the baby, a child of the Slacks, between them.

These circumstances raise a very strong presumption of guilt. And why do the inferences raise this strong presumption? Here

was a robust, healthy, full-blooded virile young fellow, with all the passions of youth and all of its weaknesses, and a mature woman of about his own age, apart from her husband for a long spell, occupying the same bedroom. What naturally took place, are we to suppose? The presumption is, of course, rebuttable, but it requires evidence of a most plausible and persuasive kind, to satisfy one that the crime was not committed, and to this end the defence bent all effort—that is, to show that the relations of this man and woman in that room were entirely innocent and explainable. In fact, when the defendant was first charged with the offence, she declared the appearances capable of explanation, and all she desired was an opportunity to explain the matter to her husband. Some women can explain anything to some husbands, I have no doubt, but when they come into a court we must view their unconventionalities according to established standards, to which appeals and considerations in the domestic forum bear no relation.

This man Mitchell, about twenty-seven years old, had been on friendly terms with Mrs. Slack's mother, and Mrs. Slack before she was married, and afterwards with Mrs. Slack, and, probably, Mr. Slack, at their home. He had a key to their house. He was a sort of a "cock-biddy," minding the baby, attending to fires and washing the dishes; some of the other boarders helped, too. He had free access to the house at all times—day and night. There is no evidence to show that before December 25th, 1916, there was any undue familiarity or intimacy which would lead one to seriously suspect anything wrong between the two up to that time. Whether there was in fact, I surely do not know; but it is not shown in the record that there was between them any such acts of familiarity, or other conduct, as would indicate a desire on the part of either to have sexual intercourse. But, on the night, or rather in the morning in question, they were certainly found in a most compromising situation, and yet this woman said in response to questions of mine on the witness-stand that she was not conscious of violating the proprieties; that she did not realize that to have this man in her bedroom from three o'clock in the morning until seven was, under the circumstances, an improper thing or would subject her to scandal if found out.

She made that statement with apparent candor. She was very naive, and sought to impress me that she did not see anything wrong or improper, or anything that anybody could find fault with. That taxed my credulity considerably.

To overcome, or to neutralize the presumption of guilt, her explanations must be probable; they must have the ring of truth; they must be supported. I do not say supported by the testimony of others, but by the surrounding circumstances, at least, to lend probability. It is true, as her counsel argued, that we cannot conjecture, we cannot speculate, as to crimes of this kind having been committed, and that we must have proof, clear and convincing, but when we have that proof in the form of admitted circumstances of a decidedly incriminating nature, unsatisfactorily explained, we are not driven to either in arriving at a verdict. Now, after eight or half-past eight in the evening, so her story goes, and on towards ten or eleven o'clock, they (she and Mitchell) began trimming the Christmas tree, and, having finished about half-past one in the morning, Mrs. Slack says she retired to her room to finish a piece of embroidery—a present she intended for her mother's Christmas. When the telephone bell rang about half-past seven in the morning, the piece of embroidery had not been finished. She had gone up to work on it, so she says, and if, in fact, she did throughout the night, she necessarily must have worked with the light burning, which is all important to her testimony, as we shall see later. She was afraid of Thompson, the detective, according to her story, and on the day before had solicited her mother and two or three of her friends to come to her house and stay over night, expressing to them her fears of Thompson. When the fire alarm came at three in the morning she went downstairs with Thompson. She was not afraid. It may be that in the excitement she forgot her fear; that one fear drove away the other. But, why did she not call Mitchell, who was there to guard? After searching downstairs she returned, Thompson coming to the door with her, or near to it; and when she got in the room, she says she found Mitchell there, and that she asked Mitchell to stay to protect her against Thompson. The place to protect her against Thompson would have been, it seems to me, in the adjoining room

of the boarder Custer (who was then away) wide awake and watching. This was the more suitable place, and the proper place, and if her conduct had been innocent, it is most likely that she would have said to Mitchell: "I wish you would stay there and awake; I am afraid." But no, she told him to stay with her in her bedroom. She, so she says, went on with her work, with Mitchell lying on the bed with his head on the foot-board, or towards it, reading; that after awhile Mitchell fell asleep, and that she pulled the covers over him; that in the morning when the telephone bell rang she went out and returned, and it was then that Bowne, the detective, walked in on them. She further says that when she left to attend to the telephone, Mitchell reversed his position, lying with his head towards the headboard, reclining on the bed, playing with the baby in the crib to the left; that she told Mitchell to keep the baby in his crib, but that the baby climbed over Mitchell and went down-stairs after her; that when they returned she told the baby to tell all about what Santa had brought; and it was then that Bowne walked in.

It does not strike me at all as the natural thing a pure, inno-cent and unsophisticated woman would do. As free and inti-mate as people are in their households—as these people were—they do not have strangers of the opposite sex stay with them in their bedroom and with the doors locked, merely for protection. But that is not all. Her story is flatly contradicted, and in a vital part, by Mitchell, the corespondent; and his testimony in turn is impeached by most reliable witnesses. His explanation is absolutely shattered, and in his fabrication of the affair he destroyed whatever merit there otherwise might have been in the story told by Mrs. Slack. Mitchell's version is as disingenous as that of Mrs. Slack. He says that after Mrs. Slack had gone up-stairs after trimming the tree, and as he was in the house to pro-tect her from Thompson, he took off his coat and vest, collar and necktie and left them down on the hall hatrack, and went up into Custer's room. Mrs. Slack occupied the front room; Custer's room was next, but not communicating. Now, at half-past one in the morning, after trimming the Christmas tree (and all know, who have children, what a tiresome and wearing job that is), he

put on Custer's bathrobe and slippers and lay down on the lounge and smoked a cigarette before going to bed. I think he said he didn't feel sleepy. Well, it doesn't appear that Custer had any cigarettes in his room, and here is the first break. He was asked where he usually carried his cigarettes, and replied, indicating, in his vest pocket. Now, then, if on the night in question he left his vest and coat downstairs, which I do not believe, how did he happen to have a cigarette upstairs? He followed this slip up quickly enough by saying that he had this one in his pants' pocket. I know it is not the practice to carry cigars in pants' pockets, and I doubt that cigarette smokers carry cigarettes there. And then, he says, he fell asleep. Mind, he was there especially to protect this woman. He was awakened by a noise on the stairs, and heard Mrs. Slack in a fairly loud tone expostulating with Thompson for fetching her downstairs. What would a man ordinarily have done under the circumstances? Would he not, to protect his charge, have rushed downstairs and demanded of this stranger his business with this woman at that early hour? But Mitchell, so he says, stepped instead into her room and hid in the closet. He says the room was in darkness. Now, if that was so, Mrs. Slack had not been embroidering, for it does not appear that she turned out the light when the alarm of fire came and relighted it after the commotion. In that respect he contradicts the crucial part of her story. If she had not been embroidering, as she said she had been, and, of course, she could not have been in the dark, then her recital must go down with that falsehood. In that one and very material matter their testimony is in hopeless conflict. This could hardly be due to a misconception of things, or forgetfulness on the part of Mrs. Slack or Mitchell. Mitchell certainly knew whether the light was on or off; Mrs. Slack must have known. Now, one or the other has told what was not the truth. I am inclined to think that Mitchell and the defendant were in her bedroom, with the light out, and when the fire alarm came he hid in the closet; that the defendant knew it, and, consequently, was not startled upon her return when Mitchell spoke to her in the dark. Furthermore, Mr. Slack, Sr., left the house shortly after, and he says he saw no.

38

light in his daughter-in-law's room. There is a dispute between Mitchell and Mrs. Slack, on the one side, and Bowne, the detective, on the other, as to how the two were dressed in the morning when Bowne entered the bedroom. Bowne's story is that they were both in the bed under the covers, Mrs. Slack in her nightgown and Mitchell with nothing on but an undershirt; that under orders Mitchell got up and dressed, and was taken under arrest to Mr. Cadwalader Slack's house nearby. Mitchell says he was fully dressed, with the exception of the articles he left down on the hallrack, having in their place the bathrobe and slippers of Custer. The defendant says she was fully dressed. Detective's testimony is competent, but it is scrutinized carefully before given credence. While it is competent, and may be admitted, we do not rely upon it unless it is corroborated, and the reason for that is obvious. There are some honest detectives, but very few, and the few must suffer for the misconduct of the many. But, in the main, in this case, the detective is corroborated, and I have no reason whatever to doubt him.

Now, what was the attitude of the pair when they were discovered? Mrs. Slack apparently took the situation very coolly. She was not greatly embarrassed. Bowne asked Mitchell if she was his wife, and Mitchell said "No." She seemed not unduly excited by that. She telephoned her mother about bail, and still she protested on the witness-stand she was not conscious of any wrong having been done. It seems to me that her conduct on that morning is susceptible of an interpretation differing very much from that which she simulated, or that which counsel attempted to ascribe to it.

In her letter of January 5th she wrote her husband of the delightful Christmas she had spent, in the hope, perhaps, that he had not heard of her escapade. What duplicity!

Now, let us look at Mitchell's story of what occurred later on, and what he said to Detective Bowne on their way to the home of Mr. Slack, Sr., and what he said there in the presence of Mr. Slack, Sr., Bowne and Miss Slack, by way of admitting his guilt. It is not evidence, of course, to support the charge, but is evidence in the case going to discredit the defendant's witness, be-

cause on Mitchell the defendant depends to support her story; on him she relies to brush away the presumption of guilt that prevails against her from admitted circumstances. Upon Mitchell the defendant rests to show what actually occurred; that the circumstances do not reflect the true situation, and that the appearance of things mistakenly point to guilt. I am only considering Mitchell's testimony in the way of credibility. On his way to the senior Slack's house he said—perhaps I do not restate his exact words—"What is the use of putting up a fight?" or "What's the use when you are caught?" And at Slack's home he said that that was the first time he had stayed in bed with Mrs. Slack all night. An effort was made to show that the witnesses might be mistaken, and that what in fact Mitchell said was that that was the first time he stayed in the Slack house all night. Now, it is not likely that he would say to them that it was the first time he stayed in the house all night, because his sleeping there was a common thing and he knew that Slack knew he had stayed there many times all night. Miss Slack, an estimable young lady of nineteen or twenty, says positively she overheard Mitchell say that this was the first time he had stayed in bed with the defendant all night. She was at the head of the stairs and out of sight when the statement was made. Bowne says the same thing, and so does Mr. Slack, Sr.—they cannot be wrong. I believe he said it, and it stands out boldly against his story told here under oath—his explanation of his presence in the room with the defendant, and the reason for his being there. The testimony of the defendant and corespondent was fabricated for the purpose of this case—it is improbable and unbelievable. The crime is established and I will advise a decree of divorce. The infant son, two or three years of age, will be awarded to the mother, with privileges to the father, who will have to pay $10 a week for his support.

*Mr. Martin P. Devlin,* for the appellant.

*Mr. Scott Scammell* and *Mr. Charles DeF. Besore,* for the respondent.

PER CURIAM.

This is an appeal from a decree of divorce granted to Leroi C. Slack, the petitioner below, the ground of the decree being the adultery of the wife committed by her with one Andrew Mitchell. The case is one entirely of fact, and no good purpose will be served by a recital of the evidence; it is enough to say that we have examined it carefully and reach the same conclusion as that expressed by the vice-chancellor, to wit, that the charge laid by the petitioner against Mrs. Slack is amply supported by the testimony of the witnesses examined in the cause.

The decree appealed from will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—12.

*For reversal*—None.